[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 16, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-14075

_____

D. C. Docket No. 97-00508-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant
Cross-Appellee,

versus

MICHAEL DEVEGTER,
RICHARD POIRIER, JR.,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(February 16, 2006)**

Before BIRCH, WILSON and COX, Circuit Judges.

WILSON, Circuit Judge:

Richard Poirier, Jr., a former partner of Lazard Freres & Co. ("Lazard"), and Michael DeVegter, a former financial advisor to Fulton County, Georgia, were involved in a bribery scheme (the "Fulton County deal"). DeVegter was paid $41,936 to award a bond refinance contract to Lazard. Both deVegter and Poirier were convicted of wire fraud and conspiracy to commit wire fraud. Both the government and the defendants agree that there was error necessitating remand under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). Several of the government's other challenges to the sentences also warrant remand, however.

The sentencing guidelines require the district court, when calculating a sentence under the commercial bribery guideline, U.S. Sentencing Guidelines Manual § 2B4.1 (2000), to use the greater of the bribe amount or the net value of the improper benefit conferred upon, in this case, Lazard. The district court used in its calculations the amount of the bribe because it found that the government did not prove the improper benefit's net value with reliable and specific evidence. The government contends that not using the improper benefit's net value was error, and, in the alternative, contests the calculated bribe amount. Also, the government appeals the district court's downward departure for both defendants.

## I. BACKGROUND

Defendants deVegter and Poirier were indicted for corrupting the process by which Fulton County, Georgia, selected an underwriter for a bond refinancing project. Fulton County hired DeVegter to serve as its independent financial advisor in soliciting and evaluating proposals from competing underwriters. Poirier was a partner with Lazard, the investment banking company that was awarded the underwriting contract. In exchange for DeVegter's assistance in ensuring that Fulton County selected Lazard's proposal, Poirier paid $83,872 to an intermediary, Cole, who in turn paid DeVegter $41,936. The jury found both defendants guilty of conspiracy in violation of 18 U.S.C. § 371 and of 18 U.S.C. § 1343 wire fraud, although it did not reach a verdict on the 18 U.S.C. §1346 honest services charge.

We have heard this case twice before. On the first occasion, we reinstated the district's court dismissal of a 18 U.S.C. § 1346 charge. *United States v. DeVegter*, 198 F.3d 1324 (11th Cir. 1999). On the second occasion, we affirmed the defendants' convictions and reversed in part the district court's sentence stating that the defendants must be sentenced under § 2B4.1 of the guidelines. *United States v. Poirier*, 321 F.3d 1024 (11th Cir. 2003) ("*Poirier II*"). We also instructed the district court to assess an obstruction of justice enhancement for both

3

defendants and an aggravating role enhancement for Poirier. *Id.* at 1036.

On the second remand, the original sentencing judge recused himself. The new sentencing judge held a hearing to determine the value of the bribe and improper benefit conferred upon Lazard as required for sentencing under § 2B4.1. The judge used the bribe amount rather than the benefit conferred upon Lazard because the court found that the government failed to establish with reliable and specific evidence the net value of the improper benefit conferred upon Lazard. The district court found that the bribe paid to DeVegter was $41,936, half of the amount that Poirier paid to Cole. The district court also granted a downward departure for both defendants under § 5K2.0 of the guidelines on the basis of aberrant behavior, physical condition, family circumstances, and a combination of those factors.

## II. STANDARDS OF REVIEW

We review the district court's findings of fact in sentencing for clear error. Clear error cannot be found unless:

> we are left with a definite and firm conviction that a mistake has been committed. Although the clear error standard is purposefully deferential to the district court, we are not required to rubber stamp the district court's findings simply because they were entered. Review for clear error does not mean no review.

*United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005) (internal citations

4

and quotations omitted).

"We review questions of law arising under the Sentencing Guidelines *de novo*." *Id.* at 1178 (internal citations and quotations omitted). *Booker* requires a sentence to be reviewed for reasonableness, but the sentence must still be calculated under the guidelines and the calculation is reviewed de novo. *Id.*

"Whether a factor is a permissible ground for a downward departure from the Sentencing Guidelines is a question of law," which we review de novo. *Id*.

We review a properly preserved claim of *Booker* error de novo and will reverse unless the error was harmless. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005) (per curiam).

## III. DISCUSSION

All of the parties acknowledge, and we agree, that we must remand this case back to the district court to correct the defendants' properly preserved claim of *Booker* error because the district court treated the sentencing guidelines as mandatory rather than advisory. *United States v. Shelton*, 400 F.3d 1325, 1330-31 (11th Cir. 2005). Although *Booker* rendered the guidelines advisory, it did not remove the court's obligation to calculate the applicable guideline range correctly so that the court could consider it in sentencing. *Crawford*, 407 F.3d at 1178. Thus *Booker* did not alter our review of the application of the guidelines or change

5

the fact that we remand any case in which the guidelines were improperly applied to a sentence. *Id*.

A.    **The Appropriate Dollar Amount to be Used in the Sentencing**

The dollar amount used in sentencing a defendant under § 2B4.1 should be the greater of the value of the bribe or the net value of the improper benefit conferred. U.S. Sentencing Guidelines Manual § 2B4.1(b)(1) (2000). "The value of the benefit 'received or to be received' means the net value of such benefit. . . . A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000." *Id*. at § 2C1.1 cmt. n.2.[1]

Assuming the bribe achieves its intended result, the benefit would usually exceed the bribe. The net value of the improper benefit need only be estimated, and the bribe amount should be used only when the net value cannot be estimated. *Id*. at § 2B4.1 cmt. n.6 (2000). The government bears the burden of establishing the estimated net value with reliable and specific evidence. *United States v. Cabrera,* 172 F.3d 1287, 1292 (11th Cir. 1999).

At sentencing, the government presented evidence that Lazard received a profit of $645,101.15 from the Fulton County Deal.[2] The district court, however,

_____

[1]  The commentary to § 2B4.1 cross-references § 2C1.1.

[2]The appropriate measure of the improper benefit should be the benefit to Lazard as opposed to merely any benefit directly attributable to Poirier. *See, e.g.*, *United States v. Cohen*, 171 F.3d 796, 803 (3d Cir. 1999) (improper benefit was net value of the contracts that

6

relied on the bribe amount to determine the appropriate sentencing enhancement under the guidelines because the government did not consider year-end bonuses paid to Lazard employees in calculating the net benefit. Lazard paid its employees a year-end bonus based on their performance on multiple bond deals. The district court concluded that the bonuses paid to Lazard employees for their work on the Fulton County deal were direct costs that were to be deducted in calculating the net value under § 2B4.1. The court held that the government did not establish with reliable and specific evidence the net value of Lazard's improper benefit because the government presented no evidence concerning the amount of the bonuses attributable to the Fulton County deal. As a result, the district court used the bribe's value in calculating the sentences.

The government counters that the bonuses are not deductible direct costs because DeVegter's own witness testified that the bonuses Lazard paid could not be readily apportioned to any particular bond deal. We have not previously decided in this Circuit what costs, if any, should be subtracted from the profit in determining the net improper benefit.

---

defendant's employer gained as a result of kickback scheme); *United States v. Landers*, 68 F.3d 882, 884 (5th Cir. 1995) (improper benefit was the net value defendant's employer derived from contracts that resulted from the bribes); *United States v. Ziglin*, 964 F.2d 756, 758 (8th Cir. 1992) (defendant subject to enhancement for the total improper benefit resulting from bribery scheme, not just for his individual share); *United States. V. Kant*, 946 F.2d 267, 269 (4th Cir. 1991) (improper benefit was amount accruing to defendant as well as his two co-conspirators).

We agree with the Fifth Circuit's approach which subtracts direct costs, but not indirect costs, from profits to determine the net improper benefit. *United States v. Landers*, 68 F.3d 882 (5th Cir. 1995). In *Landers*, the Fifth Circuit defined direct costs as "all variable costs that can be specifically identified as costs of performing a contract." *Id*. at 884 n.2. Unlike the accounting term "direct costs," for sentencing purposes, variable overhead costs not easily identifiable to a specific contract are not direct costs. *Id*. The court can ignore these variable costs in sentencing because the sentencing courts are not required to make precise calculations. *See Id*.

Applying the *Landers* standard, the district court erroneously believed the deficiency in the government's case was that year-end bonuses were not subtracted in calculating the net improper benefit. The court in part reasoned that hypothetically two defendants with different employers would receive different sentences if one employer paid bonuses at the end of the transaction and the other employer paid bonuses at the end of the year. The possibility of a sentencing disparity between two defendants, however, is no reason to ignore the distinction between fixed and variable overhead costs in calculating direct costs. *See United States v. Quinn*, 123 F.3d 1415, 1425 (11th Cir. 1997) ("[A] sentencing judge may not depart in order to avoid an apparently unjustified disparity between

8

codefendants."); *cf. United States v. Regueiro*, 240 F.3d 1321, 1325-26 (11th Cir. 2001) (per curiam) ("Disparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal). Moreover, because absolute precision is not required in calculating direct costs for sentencing purposes, the potential for different results based on different accounting practices should not prevent the courts from estimating the net improper benefit, which is often, as in this case, considerably higher than the bribe amount. *See* U.S. Sentencing Guidelines Manual § 2F1.1 cmt. n.9 (2000); *Landers*, 68 F.3d at 884 n.2.

The district court's order ignores the distinction between variable and fixed overhead costs by equating year-end bonuses with commissions. Commissions are specifically identified and readily apportioned to a given transaction, but year-end bonuses usually depend on employee performance on multiple deals throughout the year and cannot be readily apportioned to a particular bond deal. The inherent difficulty of apportioning a year-end bonus to a specific transaction takes it outside the realm of direct costs that should be subtracted from profits in determining the net improper benefit. The government's failure to include these costs therefore did not preclude the district court from relying on the net improper benefit as opposed

to the bribe amount for sentencing purposes.[3] Moreover, the defendants' have the burden of proving what direct costs should be subtracted in determining the net improper benefit, and they have not satisfied this burden in regards to the bonuses. *See*, *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998); *Landers*, 68 F.3d at 885.

## B. The Downward Departure

The district court also erred by entering a downward departure for both Poirier and DeVegter's sentences. The grounds for Poirier's downward departure were a combination of aberrant behavior, physical condition, and family circumstances. The grounds for DeVegter's downward departure were aberrant behavior, physical condition, no loss to the victim, and full satisfaction of the

---

[3] Even if the court were forced to rely on the bribe amount as opposed to the net improper benefit, it did not calculate the amount correctly. The district court found that the amount of the bribe to be used in sentence calculation was $41,936 (the amount that Cole paid to DeVegter). This was half of the $83,872 that Lazard paid Cole.

In this Court's second decision in this case, we stated, "The evidence at trial established that Poirier supervised Jim Eaton at the Lazard firm, and that he authorized Eaton to make the corrupt payoff to a person who passed half the money on to DeVegter." *Poirier II*, 321 F.3d at 1036. This finding of fact equated the full $83,872 amount as the bribe amount, and the district court was precluded from deciding otherwise under the law-of-the-case doctrine. *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir. 1984).

Furthermore, the district court concluded that the unfairness of the Government's allowing Cole to keep half of the payment while arguing for the court's use of the full amount in sentencing of Poirier and deVegther necessitates using the $41,936 figure. This is an impermissible conclusion because sentencing disparities between defendants is no justification for departing from the established law of the case. *See United States v. Quinn*, 123 F.3d 1415, 1425 (11th Cir. 1997)*; cf., United States v. Regueiro*, 240 F.3d 1321, 1325-26 (11th Cir. 2001) (per curiam).

previous sentence. Taking each separately, none other than DeVegter's full satisfaction of the previous sentence justify the departure, and thus the district court erred as a matter of law in departing.[4]

### (1) Aberrant Behavior

"[T]o qualify for an 'aberrant behavior' departure, (1) the case must be 'extraordinary,' [and] (2) the defendant's conduct must constitute 'aberrant behavior.'" *United States v. Orrega*, 363 F.3d 1093, 1096 (11th Cir. 2004). "A defendant's conduct is aberrant behavior if that conduct constitutes a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." *Id.* (internal citations and quotations omitted).

Neither defendant's criminal behavior was aberrant. DeVegter engaged in repeated acts of wrongdoing spanning months: he allowed Lazard to help design questions for the Request For Proposal ("RFP") that would be favorable to its candidacy; he gave Lazard a copy of the final RFP before it was released to other

_____

[4] Although the district court had the authority to grant a downward departure based on DeVegter's satisfaction of his previous sentence by performing community service, we would be surprised on resentencing if such a downward departure was used to reduce any actual prison time to which the court sentences DeVegter. *See, e.g.*, *United States v. Carpenter*, 320 F.3d 334, 346 (2d Cir. 2003) (holding that it would be surprising to reduce a prison term by more than half of the time spent in home detention).

11

competitors; he disclosed a competitor's submission and solicited comments from Lazard attacking the proposal; he altered the rankings to elevate Lazard to first place; and he lied to the SEC to conceal the conduct.

Poirier also engaged in repeated acts of wrongdoing: he authorized Cole to approach DeVegter; directed Eaton to keep Cole's role secret from the other Lazard bankers; discussed with DeVegter the spread range to include in Lazard's response; provided DeVegter the one-page critique advocating the advantages of Lazard's proposal over Bear Stearns'; sent the payoff to Cole under the cover of a false invoice; testified falsely to the SEC; and participated in other improprieties with Cole in connection with political fund-raising activities for the purpose of obtaining bond underwriting business. In short, this crime involved significant planning from both defendants. *See, e.g., Orrega*, 363 F.3d at 1098 ("Orrega (1) initiated two conversations with [a minor]; (2) [requested sexual acts from the minor]; (3) sent a naked picture of himself . . .; (4) setup a meeting place; (5) discussed how [they would recognize each other]; and (6) drove to the meeting place. Such facts certainly do not indicate that the crime was 'committed without significant planning.'"). In light of the defendants' significant planning, the district court erroneously found that the crimes at issue constituted aberrant behavior.

(2)    *Physical Condition*

The district court also departed downward because of the defendants'

physical conditions.  "[A]n extraordinary physical impairment may be a reason to

impose a sentence below the applicable guideline range."  U.S. Sentencing

Guidelines Manual § 5H1.4 (2000).  Physical impairment, however, is a

discouraged basis for departure.  *United States v. Simmons*, 368 F.3d 1335, 1339

(11th Cir. 2004).  "The Commission does not view discouraged factors as

necessarily inappropriate bases for departure but says they should be relied upon

only in exceptional cases."  *Koon v. United States*, 518 U.S. 81, 95, 116 S. Ct.

2035, 2045, 135 L. Ed. 2d 392 (1996) (internal quotations omitted).  Neither

defendants' conditions present an exceptional case.

Poirier suffers from Restless Leg Syndrome ("RLS").  RLS requires Poirier

to have space to exercise, especially at night when the condition is most acute.  A

Board of Prison's ("BOP") physician, who reviewed Poirier's medical records,

provided a declaration indicating that the BOP could provide Poirier with the

medical regimen (drugs, diet, and exercise) that Poirier's physicians believed to be

appropriate.

DeVegter had a severe shoulder injury, and submitted an affidavit from his

surgeon stating that he needed to undergo additional surgery followed by nine

13

more months of physical therapy. The government proposed that the reporting date for DeVegter's sentence be delayed by nine months to accommodate the recovery in lieu of a downward departure. The district court decided to delay the reporting date by nine months *and* to depart downward. The delay in beginning the sentence was reasonable. This delay, however, made a further downward departure unnecessary because by the time the sentence was to begin, surgery would have corrected the physical condition. Neither of the defendants' conditions are so "extraordinary" or "exceptional" as to justify a downward departure.

### (3)    Family Circumstances

As with Poirier's physical conditions, his family circumstances are not so extreme as to justify a downward departure. "Family . . . responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S. Sentencing Guidelines Manual § 5H1.6 (2000).

The district court partly based the downward departure for Poirier on his dyslexic son's need for tutoring as well as the fact that his mother-in-law is in failing health. The court recognizes that these circumstances are indeed unfortunate. Nevertheless, the collateral effects that Poirier's sentence has on his family do not distinguish his case from the many cases in which we have reversed

14

downward departures. *See United States v. Mogel*, 956 F.2d 1555, 1565 (11th Cir. 1992) (finding a woman with "two minor children to support, and a mother that lives with [her]" is not extraordinary); *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir. 1992) (having minor children to take care of is not extraordinary); *United States v. Allen*, 87 F.3d 1224, 1225 (11th Cir. 1996) (finding that a defendant with the role of primary caretaker for his 70 year-old father with Alzheimer's and Parkinson's diseases is not extraordinary). There is nothing inherently extraordinary about caring for a child or a sick parent. Innocent young family members, including children, commonly suffer as a result of a parent's incarceration. *Mogel*, 956 F.2d at 1565. Although we can understand Poirier's desire to minimize his sentence's adverse effects on his family, the court should not have considered these circumstances in departing downward.

        (4)    *No loss to the victim*

DeVegter argues that the fact that Fulton County did not experience a loss as a result of the bribe further justified the downward departure. The guidelines do not specifically mention this factor as one that justifies departure.

> If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

15

*Koon*, 518 U.S. at 96, 116 S. Ct. at 2045 (internal citations and quotations omitted).

A bribery case such as this one is not outside the guidelines' heartland. Even assuming that the county would have accepted Lazard's proposal in the bribe's absence (and this is a big assumption), its lack of a financial loss would not warrant a departure. If such downward departures were common, there would be less of an incentive against county financial advisors misrepresenting to investment banks the likelihood of the county accepting their proposals in the hopes of receiving a bribe that would otherwise be unnecessary. To allow such a calculating financial advisor to receive a lesser sentence than an otherwise law abiding advisor who, in a moment of weakness, accepts a bribe from an investment bank would be patently unjust. Nothing indicates that courts should employ a "highly infrequent" remedy to provide more lenient sentences to a class of criminals (i.e., individuals who give bribes but who do not actually cause a financial loss) that are not so rare as to warrant treatment outside the guidelines' heartland.

(5)   *Combination of Factors*

The district judge also referenced the combination of conditions as a basis for the downward departure. The sentencing guidelines envision situations in which a combination of departure factors could result in a departure, even if none of the factors taken individually would warrant a departure. *U.S. v. Smith*, 289

16

F.3d 696, 714-15 (11th Cir. 2002); U.S. Sentencing Guidelines Manual § 5K2.0 (2000). However, when "none of the stated bases for departure . . . are permissible grounds for a . . . departure at all [an a particular case]. . . , it would be incongruous to say that the combination of these impermissible departure grounds nevertheless warrants a departure." *Id*.

## IV.    CONCLUSION

We hold that this case must be remanded for re-sentencing under *Booker*. We further hold that the district court should rely on the net improper benefit to Lazard in applying the sentencing guidelines because bonuses were not direct costs that needed to be subtracted in estimating this amount. Finally, the district court should not grant a downward departure under the justification it has previously given for the downward departure, except for DeVegter's satisfaction of his previous sentence.

**VACATED AND REMANDED.**